# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

### Case No. 14-1329

_____

## DUSTIN LEE HONKEN,

### Appellant,

### v.

## UNITED STATES OF AMERICA,

### Appellee.

_____

## PETITION FOR CERTIFICATE OF APPEALABILITY
_____

## CAPITAL § 2255 PROCEEDINGS
(District Court Case No. CV-10-3074-LRR)

Shawn Nolan
Chief, Capital Habeas Unit
Aren Adjoian
Timothy Kane
Assistant Federal Defenders
Federal Community Defender Office
 for Eastern District of  Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

April 4, 2014

# PRELIMINARY STATEMENT

Appellant Dustin Lee Honken, the Petitioner below, is referred to herein by name or as Appellant. The United States is referred to as the Government.

References to the transcript of the trial proceedings in this case are cited as "Tr." followed by a page number. Transcripts from the § 2255 hearing are cited as "2255 Tr." followed by a page number. Transcripts of other proceedings are cited as "Tr." followed by the date of the proceeding and a page number.

Citations to exhibits refer to the exhibits that were introduced during the course of the § 2255 hearing. The District Court opinion denying relief, issued on October 4, 2013 (Doc. No. 99), is cited as "DCO."

The ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) are published at 31 Hofstra L.Rev. 913 (2003). They are herein referred to simply as the "ABA Guidelines."

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted. Parallel citations generally are omitted.

Appellate Case: 14-1329     Page: 2     Date Filed: 04/04/2014 Entry ID: 4141111

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

BACKGROUND AND PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . 1

STANDARD FOR GRANTING A CERTIFICATE OF APPEALABILITY. . . . . 5

REASONS FOR GRANTING A CERTIFICATE OF APPEALABILITY. . . . . . 7

    I.      THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE IMPEACHMENT EVIDENCE REGARDING ITS COOPERATING WITNESSES, AND THE DISTRICT COURT ERRED IN DENYING APPELLANT ACCESS TO EVIDENCE TO SUPPORT THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.     THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT'S FINDING IN A PRIOR CASE THAT THE CONSPIRACY ENDED IN MARCH 1993 SHOULD HAVE ESTOPPED THE GOVERNMENT FROM CAPITALLY CONVICTING APPELLANT OF COMMITTING MURDERS, IN JULY AND NOVEMBER 1993, DURING THE SAME CONSPIRACY, AND PRIOR COUNSEL WERE INEFFECTIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    III.   THE COURT SHOULD GRANT CERTIFICATE OF APPEALABILITY BECAUSE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    IV.   THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY LITIGATE THIS ISSUE. . . . . . . . . . . . . . . . . . 47

Appellate Case: 14-1329    Page: 3    Date Filed: 04/04/2014 Entry ID: 4141111

**TABLE OF CONTENTS** (continued)

V.    THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE APPELLANT WAS DEPRIVED OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN THE TRIAL COURT DISMISSED A JUROR DURING PENALTY PHASE DELIBERATIONS BUT UPHELD THE GUILT PHASE VERDICT, AND COUNSEL INEFFECTIVELY LITIGATED THESE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Appellate Case: 14-1329    Page: 4    Date Filed: 04/04/2014 Entry ID: 4141111

Appellant, Dustin Lee Honken, a death-sentenced federal prisoner, sought relief from his convictions and death sentence under 28 U.S.C. § 2255 in the United States District Court for the Northern District of Iowa. After briefing and an evidentiary hearing, the District Court denied relief and denied a Certificate of Appealability on all claims. The District Court later denied Appellant's motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e). This Petition for Certificate of Appealability follows.

## BACKGROUND AND PROCEDURAL HISTORY

On April 11, 1996, Mr. Honken was indicted on charges of conspiracy to manufacture and distribute methamphetamine between 1992 and 1996 and related drug charges. N.D. Iowa Case No. 96-CR-3004-MWB, Doc. Nos. 5, 42. He pled guilty to two counts of the superseding indictment on June 2, 1997. *Id*., Doc. No. 76.

The District Court presided over an extended sentencing hearing between December 15, 1997, and February 24, 1998. *Id*., Doc. Nos. 137-38, 177-82. At the conclusion of the hearing, the District Court made a number of findings, including that the conspiracy to manufacture and distribute methamphetamine ceased after Mr. Honken's pretrial release on bond in March, 1993. Tr. 2/24/98 at 1192. On February 25, 1998, the District Court formally entered judgment and sentenced Mr. Honken to a term of 292 months imprisonment. Case No. 96-CR-3004-MWB, Doc. No. 183.

1

After an appeal and remand from this Court, the District Court entered an amended judgment and sentenced Mr. Honken to 324 months imprisonment. *Id.*, Doc. No. 219.

On August 30, 2001, Mr. Honken was charged in the instant case in a seventeen-count indictment for five murders occurring in July and November 1993. N.D. Iowa Case No. 01-CR-3047-MWB, Doc. No. 1. Counts 1 to 5 of the Superseding Indictment each charged Mr. Honken with murder of a witness under 18 U.S.C. § 1512. *Id.*, Doc. No. 46. Counts 6 and 7 alleged various conspiracies under 18 U.S.C. §§ 371 and 373. *Id.* Counts 8 to 12 and Counts 13 to 17 alleged murders of the five victims "while" Mr. Honken was engaged in a drug conspiracy and a continuing criminal enterprise, respectively, between 1992 and 1998, under 21 U.S.C. § 848. *Id.* On these latter ten counts, the Government sought death sentences. *Id.*[1] Attorney Alfredo Parrish, who represented Mr. Honken in the prior drug case, was again appointed to represent him, this time with co-counsel.

Trial was held between August 17, 2004, and October 27, 2004. Many of the witnesses presented and issues litigated at trial were the same as in the 1997 to 1998 sentencing proceedings on the prior drug charges in the same court. In its case-in-chief, the Government presented the testimony of fifteen inmates and former inmates

---

[1] In 1993, at the time of the murders, Congress had not authorized the death penalty for witness murders under 18 U.S.C. § 1512. The only way that the Government could obtain a death sentence in this case was thus to charge that the murders occurred during the drug conspiracy/continuing criminal enterprise.

2

who had been incarcerated with Mr. Honken, and they testified to statements that Mr. Honken allegedly made regarding the murders and/or various violent schemes. For the most part, these witnesses denied receiving benefits or otherwise having been coerced with respect to their testimony. Mr. Honken was convicted on all counts.

At the penalty phase, the Government's evidence in aggravation consisted of its guilt phase evidence and victim impact testimony. In mitigation, defense counsel presented several friends and family members who testified about Mr. Honken's upbringing and character. Counsel also presented a prison expert who testified regarding future dangerousness. Counsel did not, however, present any expert mental health evidence regarding Mr. Honken. Nor did counsel present evidence regarding the damaging effects of Mr. Honken's methamphetamine addiction in the months before the crimes.

The jury retired for penalty phase deliberations on Thursday, October 21, 2004. That afternoon, Juror 523 approached court staff and reported various inappropriate comments her boss had been making to her regarding the case. Tr. 3944-45. After several rounds of questioning by the court on October 21, 22, and 25, Juror 523 was dismissed and replaced with Alternate Juror 425. The reconstituted jury sentenced Mr. Honken to life imprisonment on six of the capital counts, and to death on the remaining four counts.

The court conducted a post-trial evidentiary hearing on the juror dismissal

Appellate Case: 14-1329    Page: 7    Date Filed: 04/04/2014 Entry ID: 4141111

issue. The court ruled that Juror 523's testimony was inconsistent, that she had been "troubled and upset" by the stress of serving on a capital jury, and that she held "a desire to finish deliberations as quickly as possible and to 'get her life back.'" *United States v. Honken*, 381 F. Supp. 2d 936, 1034 (N.D. Iowa 2005). Mr. Honken's motion for a mistrial was denied.

This Court affirmed the convictions and sentences on September 12, 2008. *United States v. Honken*, 541 F.3d 1146. The Supreme Court denied certiorari. *Honken v. United States*, 558 U.S. 1091 (2009).

On December 13, 2010, Mr. Honken filed his *Motion for Relief Pursuant to 28 U.S.C. § 2255 or 28 U.S.C. § 2241*. Doc. No. 1.[2] On December 14, 2010, the District Court issued an "Initial Review Order," finding that it did not plainly appear from the § 2255 Motion and the underlying record that Mr. Honken was not entitled to relief. Doc. No. 2. Two days later, on December 16, 2010, District Court Judge Mark Bennett, who presided over trial and to whom the § 2255 initially was assigned, transferred the case to Chief Judge Linda Reade. Doc. No. 3.

Thereafter, Mr. Honken sought discovery from the Government, including with respect to promises and threats given to the fifteen inmates and former inmates who testified at trial, and with respect to the juror misconduct issue. The District Court

---

[2] Citations to docket entries that do not recite a case number refer to entries in the § 2255 proceedings below, N.D. Iowa Case No. 10-CV-3074-LRR.

4

denied virtually all of the discovery requests.  Doc. Nos. 41, 63.

In 2011, the District Court held an evidentiary hearing, conducted in part by deposition, at which Appellant presented the testimony of trial counsel, various mental health experts, and lay witnesses.  On October 4, 2013, the District Court issued a 398-page opinion denying relief and denying a Certificate of Appealability on all claims.  Doc. No. 99.  On December 11, 2013, the court denied Appellant's motion to alter or amend the judgment under Fed. R. Civ. P. 59(e).  Doc. No. 104.

Appellant timely filed a Notice of Appeal on February 7, 2014.  Doc. No.105. This Court subsequently granted until April 4, 2014, to file a Petition for Certificate of Appealability.

## STANDARD FOR GRANTING A CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability (COA) should issue if the appellant has made "a substantial showing of the denial of a constitutional right."  To meet this modest standard, the applicant need only show that "reasonable jurists could debate . . . whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) ("We look to the district court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason.").

5

As *Miller-El* emphasized, "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." 537 U.S. at 338. This Court has accordingly recognized that the "reasonable-jurists-could-debate" threshold is a "modest standard." *Randolph v. Kemna*, 276 F.3d 401, 403 n.1 (8th Cir. 2002) (internal quotation marks omitted). It is satisfied if "'a court could resolve the issues in a different manner.'" *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.1 (1983)) (internal alterations omitted).

"Any doubt regarding whether to grant a COA is resolved in favor of the petitioner," and, in a capital case, "the severity of the penalty may be considered in making this determination." *Haynes v. Quarterman*, 526 F.3d 189, 193 (5th Cir. 2008); *accord Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997). Finally, as this is a federal case, analysis of Appellant's claims does not incorporate deference to any state court ruling, rendering the claims more open to debate among jurists of reason than in § 2254 cases. *Cf. Miller-El*, 537 U.S. at 337 (ruling that denial of COA was error despite "AEDPA hav[ing] placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners."); *accord id.* at 348 (Scalia, J., concurring) ("the Court's willingness to consider the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA) limits on habeas

6

relief in deciding whether to issue a certificate of appealability (COA) is in accord with the text of 28 U.S.C. § 2253(c).").

## REASONS FOR GRANTING A CERTIFICATE OF APPEALABILITY

**I.** **THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE IMPEACHMENT EVIDENCE REGARDING ITS COOPERATING WITNESSES, AND THE DISTRICT COURT ERRED IN DENYING APPELLANT ACCESS TO EVIDENCE TO SUPPORT THIS CLAIM.**[3]

At trial, the Government relied upon more than a dozen jailhouse informant witnesses to testify that Mr. Honken had made various inculpatory statements. In this manner, the Government attempted to fill in significant gaps in its case, given that it possessed very little direct evidence of Mr. Honken's involvement in the murders. The Government did not, however, turn over to the defense all evidence that it was obligated to turn over under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, with respect to these informant witnesses. Appellant demonstrated his entitlement to relief on this claim at the evidentiary hearing below, and the District Court erred in ruling to the contrary.

Moreover, Appellant's counsel was prevented from being able to present the full extent of *Brady* violations due to the rulings of the District Court. Specifically, several of the most important witnesses who testified at trial are currently in the

---

[3] This issue was raised as Claim Three in the District Court. *See* Doc. No. 19 at 27-45.

Appellate Case: 14-1329　　Page: 11　　Date Filed: 04/04/2014 Entry ID: 4141111

federal witness protection program (also known as the witness security program, or "WitSec"). The District Court prevented Appellant's counsel from having access to any WitSec witness. This Court should grant a COA on this claim; it is debatable among jurists of reason whether relief should have been granted on the existing record and, at a minimum, Appellant's counsel should have been afforded access to the witnesses who testified at trial.

### A. Appellant Demonstrated at the Hearing that the Government Withheld Favorable Information Regarding Four Informant Witnesses Whom Counsel was Able to Interview

The Due Process Clause requires the prosecution to disclose material, favorable evidence, including impeachment evidence, to the accused in a criminal trial. *Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United* States, 405 U.S. 150, 153-56 (1972); *Brady*, 373 U.S. at 87. The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

At the § 2255 hearing, Appellant presented testimony from four Government informant witnesses: Dennis Putzier, Anthony Johnson, Terry Bregar, and Dan Cobeen. Each of these four witnesses testified to receiving benefits, promises, and threats that were not disclosed to trial counsel, in violation of Appellant's due process rights.

8

Appellate Case: 14-1329     Page: 12     Date Filed: 04/04/2014 Entry ID: 4141111

### 1. Dennis Putzier

Dennis Putzier was incarcerated with Mr. Honken at the Woodbury County Jail in 1996. He testified at trial that 1) Mr. Honken confessed to the killings in this case; 2) Mr. Honken wanted Putzier to escape from the jail so that Putzier could kill Timothy Cutkomp, who was a key witness against Mr. Honken; 3) Mr. Honken also bonded fellow inmate Dean Donaldson out in order to kill Cutkomp; and 4) Mr. Honken attempted to escape from the jail himself. Tr. 1286-1320. Mr. Honken supposedly confided all of this information to Putzier and trusted Putzier enough to enlist his help despite the fact that the two did not know each other prior to being incarcerated, were only incarcerated together a short time, were housed in different cell blocks, and thus never actually met face-to-face. Tr. at 1291-92. Putzier was asked on direct examination at trial whether he received any benefit for his testimony, other than a sentence reduction on his charge for aiding and abetting Mr. Honken's attempted escape from the jail. Tr. at 1279-80. He testified that he had not. Tr. at 1280.

Putzier's trial testimony was markedly inconsistent from his prior testimony in front of the grand jury. At the grand jury, Putzier did not testify that Mr. Honken confessed to him, nor did he testify about anyone's attempt to escape or to do harm to Cutkomp. Pet. Ex. 29; 2255 Tr. at 200-05. At trial, the Government asked Putzier why he made a sudden about face in his testimony. Tr. at 1308. Putzier claimed his

9

newfound willingness to implicate Mr. Honken came about because federal agents "came and talked to [him] and told [him] to think about what [he was] doing." *Id.* Putzier also testified that agents suggested to him that others had already given information, so he may as well give information, too. Tr. at 1309-10.

Putzier's testimony at the § 2255 hearing revealed a different reason for his sudden change of heart. He did not, in fact, change his testimony because law enforcement officers told him "to think about what [he was] doing," but rather because federal agents threatened him with a life sentence for conspiring to kill Cutkomp if he did not cooperate. 2255 Tr. at 207. Corroborating Putzier's § 2255 testimony was a recent letter he wrote to a federal judge in conjunction with new drug charges he was facing [text reproduced as it appears in original]:

> Ya know I do not trust the fed's. Tim Calliton Mark Hinze, and one outher D.E.A. officer came to the prison in Clarinda, IA, in 98 and told me that if I did not testify on Dustin Honken that they would give me 365 months to life! And they knew I did not know Dustin Honken. I talked to him through a key hole in a fire door and wrote him some letter's. They knew I could not excape, help him excape, and that I was not going to and would not kill any one! And told me that! But said if I did not do what they want I would do life in prison! They even told me how to say everything in court! And when that was over they told me to tell on two outher people and they would drop all the charges. I told them I did not come to tell I came to save my life for doing nothing. I'm afraid of the fed's. they can do what ever they want. And told me so! And I beleave Dustin Honken got what he had coming to him. If I would of knowen he killed them people and them children I would of told because it is right! I don't think the fed's have a right to take peoples lives for no reason eather!

10

Appellate Case: 14-1329     Page: 14     Date Filed: 04/04/2014 Entry ID: 4141111

Pet. Ex. 26 at 2-3. Putzier's letter and post-conviction testimony were consistent with statements he gave to law enforcement in the lead-up to the hearing. *See* Pet. Ex. 27, 28.

The defense was not informed that Putzier was threatened with a life sentence if he refused to cooperate against Mr. Honken. The jury never learned that the Government "knew [Putzier] did not know Dustin Honken," or that the Government "told [Putzier] how to say everything in court." Trial counsel obviously could have used such information, not only to impeach Putzier, but to challenge the reliability and good faith of the Government investigation. *See* 2255 Tr. at 15-16.

### 2. Anthony Johnson

Anthony Johnson offered testimony at trial that he purchased a methamphetamine recipe from Mr. Honken while the two were incarcerated together at the Woodbury County Jail. When asked by the Government whether he received any benefit for testifying against Mr. Honken, Johnson replied "[n]one whatsoever." Tr. at 2090. On cross-examination at trial, Johnson admitted only that he had "reached an agreement with the Government that anything that [he] told them about [his] activities in the jail wouldn't be used against [him]." Tr. at 2099.

At the § 2255 hearing, however, Johnson made clear that the benefits he received for offering information against Mr. Honken went beyond insulating himself from new charges relating to the meth recipe. In addition to this benefit, Johnson

11

received assurances that he would not be charged with significant, unrelated criminal conduct, including charges for obtaining property from drug sales and illegally delivering firearms. 2255 Tr. at 284-85. Like Putzier, Johnson was threatened with these additional charges by federal agents after initially refusing to provide information against Mr. Honken. *Id.*; *see also* Pet. Ex. 122 (Johnson Decl.).

### 3. Terry Bregar

Terry Bregar testified that Mr. Honken was involved in an escape plan at the Woodbury County Jail and that Mr. Honken made a hand motion as if shooting a gun while talking about the victims in this case. The Government elicited testimony from Bregar at trial that his sentence was reduced by four and a half years in return for his cooperation. Tr. at 1385.

At the § 2255 hearing, Appellant presented significant impeachment material that was not disclosed at trial. For example, it was documented in Bregar's Bureau of Prisons medical records in 1997 that he had previously had a "vascular accident" (i.e., a stroke). Pet. Ex. 125 at 4. Indeed, Bregar complained to prison medical staff of memory loss and concern about Alzheimer's symptoms. *Id.* at 3.

Bregar also testified that the Government exerted significant pressure on him to state that Mr. Honken confessed to him about the murders. 2255 Tr. at 465-66. While Bregar did not succumb to these tactics, they further shed light on the Government's unreliable investigation into these crimes and into the improper

12

pressure exerted on cooperating witnesses.

Finally, Bregar testified that 5 or 6 of the jailhouse informant witnesses who testified at trial were transported in a single van together in advance of their testimony. 2255 Tr. at 467. The van ride lasted for "hours" (because the inmates were housed in different facilities), during which time the inmates discussed Mr. Honken. *Id.* at 468-69. Some inmates discussed how they could shave "[y]ears off their sentence" by testifying. *Id.* at 469. Bregar testified that the United States Marshals in the van were able to hear these conversations. *Id.* at 483-84.

### 4. Dan Cobeen

Dan Cobeen testified at trial regarding Mr. Honken's attempts to manufacture methamphetamine in 1995. He was asked on direct examination whether he received any benefits for his testimony. Tr. at 585-86. Cobeen testified that he was given $7,000 in relocation money, but otherwise received no benefit. *Id.* He was specifically asked if he was given any benefit regarding the state charges he had at the time, which he denied. *Id.* On cross-examination, defense counsel asked Cobeen whether he was aware what arrangements were made so that he no longer had to report to his probation officer, and the Government objected, stating: "[t]here's no evidence saying arrangements were made. Misstates the evidence." Tr. at 608-09.

At the § 2255 hearing, however, Cobeen testified unequivocally that the Government arranged for Cobeen to get a year dropped from his probation as a result

13

Appellate Case: 14-1329     Page: 17     Date Filed: 04/04/2014 Entry ID: 4141111

of his cooperation against Mr. Honken:

> Q:    Didn't Mr. Graham get you off probation at an earlier time so that you could do this cooperation?
>
> A:    I think I got a year dropped.
>
> Q:    But you didn't testify to that in front of the jury in Mr. Honken's murder trial, did you?
>
> A:    I don't recall if they asked me that or not.

2255 Tr. at 304-05. The Government did not cross-examine Cobeen at the hearing. *Id*. at 305.

**B.    The Undisclosed Information Was Material Under *Brady***

A prosecutor's failure to disclose favorable evidence requires that relief be granted when the evidence would have been material to the trial. *Kyles*, 514 U.S. at 432 (*citing Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675-76. The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Thus, to show materiality, Appellant need not demonstrate that the non-suppressed evidence would have been inadequate to convict, because "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. *Id*. at 435 n.8. The

Appellate Case: 14-1329    Page: 18    Date Filed: 04/04/2014 Entry ID: 4141111

materiality of evidence must be "considered collectively, not item-by-item." *Kyles*, 519 U.S. at 436; *accord Liggins v. Burger*, 422 F.3d 642, 651-52 (8th Cir. 2005).

The evidence outlined above establishes that the violation was material. Without the informant testimony, the case against Mr. Honken was circumstantial and tenuous. There was no eyewitness testimony. There was no confession to law enforcement. There was no forensic evidence connecting him to the crimes. The only direct evidence that Mr. Honken committed these crimes came from the jailhouse informants who testified that Mr. Honken had confessed to them. Had the Government turned over the suppressed evidence, the testimony of these witnesses – and the Government's entire investigation – would have been cast in a significantly different light, and thus there is a reasonable probability of a different verdict and/or sentence. *See*, *e .g.*, *Kyles*, 514 U.S. at 449 & n.19.

**C.     The District Court Erred in Denying Relief with Respect to the Undisclosed Evidence Revealed by the Witnesses Presented at the Hearing**

The District Court denied relief with respect to the evidence pertaining to Putzier, Johnson, Bregar, and Cobeen. It ruled that the Government did not withhold any exculpatory evidence relating to any of these witnesses. DCO 99-100. The District Court's ruling amounted to a wholesale rejection of all of Appellant's evidence. *See id.* The ruling is not supported by the record; as the above discussion makes clear, multiple trial witnesses falsely testified that they received no benefit or

15

a much lesser benefit than what they in fact received. The District Court erred in failing to acknowledge this evidence for what it was.

The District Court also ruled that Appellant could not demonstrate *Brady* materiality. *Id*. at 101-02. The court specifically stated that "[a]n overwhelming amount of direct evidence, which includes recorded statements, inculpates the movant." *Id.* at 101. The District Court's characterization of the trial evidence cannot be squared with the record of this case.

In cases that truly involve "overwhelming" evidence, prosecutors do not need to place over a dozen jailhouse informants on the stand. Instead, prosecutors have the strongest incentives to resort to informant testimony in cases in which they are least able to ensure veracity. Steven M. Cohen, *What is True? Perspectives of a Former Prosecutor*, 23 Cardozo L. Rev. 817, 822 (2002) ("[I]n most situations a cooperator's value increases in inverse proportion to the [other] information in possession of the prosecutor.").

Contrary to the District Court's reasoning, the Government at trial presented a parade of unreliable informant witnesses because they were necessary to obtain a conviction and death sentence. It is at least debatable among jurists of reason that a capital murder case that relied so heavily on informant testimony violates due process and the Eighth Amendment when important impeachment evidence is not disclosed to defense counsel.

16

**D.    The District Court Further Erred by Preventing Appellant's Counsel from Fully Investigating and Presenting this Claim**

The District Court also prevented Appellant's counsel from gaining access to key informant witnesses who testified at trial.  In Appellant's § 2255 motion, he proffered evidence, set forth above, from those witnesses whom counsel was able to contact.  Appellant's counsel also sought access to all of the informant witnesses who were placed in the WitSec program, but counsel needed and requested the District Court's assistance to do so.  Doc. No. 19 at 45 n.9; Doc. No. 32 at 5-6.[4]  Counsel specifically suggested "gaining access to these individuals under a protective order, which would provide for the non-disclosure of witness locations or other information outside of undersigned counsel's office, even to Petitioner himself."  Doc. No. 32 at 5 n.2.

The District Court denied the motion, although it provided Appellant with another opportunity to request witness access:

---

[4] The WitSec witnesses played central roles in the Government's case, and provided crucial, highly-damaging testimony at trial.  This testimony included allegations that Mr. Honken confessed, and in so doing, "went into great detail about the murders." *Honken*, 541 F.3d at 1151.  It also included testimony that Mr. Honken "planned to call his associates as witnesses in Sioux City, and then overpower and kill the guards and escape.  After escaping, Honken intended to murder witnesses, law enforcement officers, and a federal prosecutor.  To prepare for their escape, Honken and his associates practiced retrieving an officer's weapon, learning how to remove handcuffs with minimal tools, and training in martial arts scenarios centering around encounters with an armed escort." *Id.*

17

> Although it will not permit the movant to interview all of the witnesses who is in the WitSec program merely to determine if they could provide information that might support his claims, the court finds that it should permit the movant an additional opportunity to request appropriate discovery that pertains to the witnesses who are in the WitSec program because requesting appropriate discovery is especially important in cases that involve the penalty of death.

Doc. No. 41 at 11.

Appellant then filed a renewed motion for access to the informants. He noted in his renewed request, however, that the District Court's ruling created a catch-22 insofar as it required a specific proffer as to what each WitSec witness would provide without the opportunity to speak with them. Doc. No. 46 at 2-3. Appellant nevertheless argued that the pattern of *Brady* violations he *was* able to demonstrate (*see supra*) made it reasonably probable that the WitSec witnesses would provide similar information. *Id.* at 3. Appellant noted that the information he was seeking from the WitSec witnesses was not likely to be documented, and that gaining access to the witnesses was therefore crucial to his ability to make out his claim. *Id.* at 3-4.

The District Court again denied relief, stating:

> The movant did not provide specific evidence that the requested discovery would support his claims and only offered generalized statements regarding the possibility that discoverable material may exist. Because the movant's requests are overly broad in that they encompass all of the witnesses who are in the WitSec program, it is not appropriate to allow the movant to interview them.

Doc. No. 63 at 3.

Appellate Case: 14-1329    Page: 22    Date Filed: 04/04/2014 Entry ID: 4141111

The ruling of the District Court effectively immunizes the Government from collateral challenge by blocking counsel's ability even to *investigate* potential constitutional claims. This violates Appellant's rights, and sets a dangerous precedent. Any time the Government seeks to insulate itself from collateral challenge, it need only place its key witnesses in WitSec following trial. Indeed, were the District Court's ruling to stand, the Government could specifically use WitSec as a tool to cover up *Brady* violations at trial, thereby guaranteeing that they would never be uncovered by the defense in post-conviction.[5]

The District Court's blocking of access to crucial witnesses violates due process and is contrary to the core, longstanding principles requiring full and fair evidentiary development of potentially meritorious habeas claims. *See, e.g., Boumediene v. Bush*, 553 U.S. 723, 786 (2008) ("For the writ of habeas corpus . . . to function as an effective and proper remedy in this context, the court that conducts the habeas proceeding . . . must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding. Federal habeas petitioners long have had the means to supplement the record on review, even

---

[5] The Government's ability to block access to witnesses would have consequences for other constitutional claims as well. A § 2255 petitioner would have an equally hard time discovering and presenting a claim of ineffective assistance of counsel, for instance, were he unable to interview key witnesses. Nor would the Government be limited to using this tactic with jailhouse informants; it could just as easily place eyewitnesses to a crime in WitSec.

19

Appellate Case: 14-1329    Page: 23    Date Filed: 04/04/2014 Entry ID: 4141111

in the postconviction habeas setting."); *see also Townsend v. Sain*, 372 U.S. 293, 313 (1963) (recognizing that reliable habeas proceedings typically require a full and fair hearing on claims involving factual disputes).

The District Court's ruling also ran afoul of Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts*. Rule 6 states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). The Supreme Court has explained that "[t]he very nature of the writ demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291.

The District Court's approach here was decidedly inflexible. The court faulted Mr. Honken for failing to specify the information witnesses might provide, while simultaneously refusing to permit counsel to have access to them. Such a ruling does not comport with the habeas rules and does not fulfill the requirement of a full and fair hearing.

20

Finally, given the unique severity of punishment in capital cases, there is an especial "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (plurality opinion); *see also Spaziano v. Florida*, 468 U.S. 447, 468 (1984) (Stevens, J., concurring). These heightened procedural safeguards must include giving counsel access to key trial witnesses during a federal capital defendant's only opportunity to collaterally challenge his conviction and sentence.

**II.    THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT'S FINDING IN A PRIOR CASE THAT THE CONSPIRACY ENDED IN MARCH 1993 SHOULD HAVE ESTOPPED THE GOVERNMENT FROM CAPITALLY CONVICTING APPELLANT OF COMMITTING MURDERS, IN JULY AND NOVEMBER 1993, DURING THE SAME CONSPIRACY, AND PRIOR COUNSEL WERE INEFFECTIVE.[6]**

The question whether Appellant was continuing to engage in a drug conspiracy during the time period in which these murders occurred was twice litigated in the District Court. The first time, in sentencing proceedings in 1997 and 1998, the District Court found and entered a judgment that Appellant was not engaged in the conspiracy after March 1993. The second time, in the ten capital counts for which Appellant was convicted, the jury reached the opposite conclusion. The first time, the answer to the question meant the difference between a 27-year prison sentence and a mandatory life sentence; the second time, the stakes were life and death. The first

---

[6] This issue was raised as Claim Two below. *See* Doc. No. 19 at 10-27.

Appellate Case: 14-1329    Page: 25    Date Filed: 04/04/2014 Entry ID: 4141111

time, the Government purposefully sought final resolution of the question, despite knowing of the potential for "collateral consequences." The second time, defense counsel inexplicably failed to assert collateral estoppel.

It has been "an established rule of federal criminal law" for nearly a century that, "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) (citing *United States v. Oppenheimer*, 242 U.S. 85 (1916)). This rule "is embodied in the Fifth Amendment guarantee against double jeopardy," *Ashe*, 397 U.S. at 445, and the rule holds regardless of whether the issue of fact was determined by a jury or by a judge. *Oppenheimer*, 242 U.S. at 87-88 ("however the issue was raised in the former case, after judgment upon it, it could not be reopened in a later prosecution.").

## A. The Prior Drug Conspiracy Case

In 1996, Mr. Honken pled guilty to conspiring to manufacture and distribute quantities of methamphetamine in violation of 21 U.S.C. § 846. *See* N.D. Iowa Case No. 96-CR-3004-MWB, Doc. Nos. 42, 76. The District Court accepted Mr. Honken's guilty plea with the understanding that:

> when it comes time for sentencing, we're going to start with a clean slate, and you'll be able to contest I think primarily the quantities, your role in the offense but basically anything else that you and Mr. Parrish want to contest at the time of sentencing.

22

Appellate Case: 14-1329    Page: 26    Date Filed: 04/04/2014 Entry ID: 4141111

Tr. 6/2/97 at 14.

One of the issues disputed by the parties was whether the drug conspiracy continued after Mr. Honken's pre-trial release on March 26, 1993, and thus whether any conspiratorial acts were committed between that date and March 21, 1995. If so, the sentencing guidelines required a three-point enhancement. *See* 1997 Sentencing Guidelines § 2J1.7. Under the guidelines, the enhancement meant the difference between a mandatory life sentence and a finite term of imprisonment. The parties thus had significant incentive to litigate – and vigorously contested – the issue.

Similarly, the United States sought an enhancement for possession of a firearm, and in support alleged various facts, including that Mr. Honken had possessed a Tec-9 handgun in the course of the drug conspiracy, had purchased a (different) handgun while on pretrial release in 1996, and had sought a high-powered automatic firearm. *See* Tr. 2/24/98 at 1220-22. Again, had the District Court found in favor of the Government on any of these allegations, the enhancement would have resulted in a mandatory life sentence instead of the 324-month sentence ultimately imposed.

The Government – which at the time of the sentencing hearing believed that Mr. Honken had killed the five witnesses – vigorously litigated these issues in seeking a life sentence for Mr. Honken. The Government presented twenty-five witnesses and numerous exhibits (including extensive, secretly recorded audiotapes of conversations Mr. Honken had while on pre-trial release) in support of its

23

allegations, over the course of five days of court hearings between December 15, 1997, and February 24, 1998.  As the District Court found, the Government litigated the disputed issues with "thoroughness and zealousness."  Tr. 2/24/98 at 1228.

The Government, defense counsel Mr. Parrish, and the District Court were all well aware of potential "collateral consequences" of litigating these issues in the sentencing proceedings. *Id.* at 1239.  Over the course of the sentencing proceedings, repeated mention was made of the ongoing grand jury investigation into the disappearance of the five witnesses, and of the potential that sentencing findings, in Mr. Parrish's words, may later "be binding on any additional court."  Tr. 1/25/00 at 6; *see also, e.g.*, Tr. 6/2/97 at 39; Tr. 12/15/97 at 66, 110-16; Tr. 2/17/98 at 628, 825; Tr. 2/24/98 at 1232, 1240. Despite these concerns, the Government fully litigated these issues in its pursuit of a life sentence.

At the conclusion of the hearing, the District Court made several findings against the Government and in Mr. Honken's favor.  The court found that Mr. Honken did not continue engaging in the drug conspiracy while on pretrial release between March, 1993, and March, 1995.  Tr. 2/24/98 at 1192.  The court's final judgment specifically reflected this finding. N.D. Iowa Case No. 96-CR-3004-MWB, Doc. No. 183 at 7 (Judgment 2/25/98) ("the defendant did not commit a portion of the offense while on bond"); *Id.*, Doc. No. 219 at 7 (Amended Judgment 2/1/00) (same).

The court likewise rejected the Government's allegations that Mr. Honken had

24

possessed or sought to possess firearms in the course of the conspiracy, and thus the court denied the Government's request for a firearm enhancement. Tr. 2/24/98 at 1246. Again, the court's final judgment reflected this finding. N.D. Iowa Case No. 96-CR-3004-MWB, Doc. No. 183 at 7 (Judgment 2/25/98) (adopting the factual findings in the presentence report, except as otherwise noted); *Id.*, Doc. No. 219 at 7 (Amended Judgment 2/1/00) (same).

## B. The Capital Case

Despite these prior judicial findings against the Government, the Government alleged and sought to prove these same factual issues as elements of the crimes and as conspiratorial acts in the capital trial. For example:

> (1) the charges set forth in Counts 8 through 11 of the Superseding Indictment alleged that, "[o]n or about July 25, 1993, . . . **while** knowingly engaging [in a drug conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A)] between 1992 and 1998," Mr. Honken committed four murders;[7]
>
> (2) the charge set forth in Count 12 of the Superseding Indictment alleged that, "[o]n or about November 5, 1993, . . . **while** knowingly engaging [in a drug conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A)] between 1992 and 1998," Mr. Honken committed the fifth murder;
>
> (3) the charges set forth in Counts 13 through 16 of the Superseding Indictment alleged that, "[o]n or about July 25, 1993, . . . **while** engaging in and working in furtherance of a continuing criminal

---

[7] *See also* N.D. Iowa Case No. 01-CR-3047-MWB, Doc. No. 512, Preliminary and Final Instructions to the Jury, 10/14/04 at 2, 23-24, 28.

Appellate Case: 14-1329   Page: 29   Date Filed: 04/04/2014 Entry ID: 4141111

enterprise . . .[involving] a continuing series of narcotics violations under [21 U.S.C. § 801, et seq.] occurring between 1992 and 2000," Mr. Honken committed four murders;

(4)    the charge set forth in Count 17 of the Superseding Indictment alleged that, "[o]n or about November 5, 1993, . . . **while** engaging in and working in furtherance of a continuing criminal enterprise . . .[involving] a continuing series of narcotics violations under [21 U.S.C. § 801, et seq.] occurring between 1992 and 2000," Mr. Honken committed the fifth murder;

(5)    the Government presented evidence and argument that Mr. Honken possessed various handguns in the course of the drug conspiracy. *E.g.*, Tr., 20, 24 (Government opening statement); Tr., 739-46 (testimony of Timothy Cutkomp); Tr., 1063-69 (testimony of Rick Held); Tr., 3216, 3239-42, 3246-47 (Government closing argument).

Mr. Honken's rights under the Fifth Amendment and federal law barred relitigation of these issues.  The District Court's prior findings that the drug conspiracy did not continue after March, 1993, and through March, 1995, and that Mr. Honken committed no acts in furtherance of the conspiracy during that time period, precluded as a matter of law the Government's attempt to establish the statutory nexus in Counts 8 to 17 that the murders occurred "while" Mr. Honken was engaged in the drug conspiracy and continuing criminal enterprise.

C.    **The Double Jeopardy Violation**

Under the Double Jeopardy Clause, "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties."  *Ashe*, 397 U.S. at 443; *see also Nesbitt v. Hopkins*, 86 F.3d 118,

26

Appellate Case: 14-1329    Page: 30    Date Filed: 04/04/2014 Entry ID: 4141111

120 (8th Cir. 1996) (a factual issue may not be relitigated where the issue "was necessarily determined by the factfinder against the Government and, in the second prosecution, that same fact is required to be proved beyond a reasonable doubt in order to convict.") (internal quotation omitted); *State v. Butler*, 505 N.W.2d 806 (Iowa 1993). This rule governs regardless of whether the issue of fact was determined by a jury or by a judge; the only question is whether the issue's determination was implicit in "a valid and final judgment." *Ashe*, 397 U.S. at 443; *see also Oppenheimer*, 242 U.S. at 87-88 ("however the issue was raised in the former case, after judgment upon it, it could not be reopened in a later prosecution."). In analyzing a claim of collateral estoppel, a court's "inquiry into the evidence 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *United States v. Howe*, 590 F.3d 552, 557 n.5 (8th Cir. 2009) (quoting *Ashe*, 397 U.S. at 444).

As set forth above, factual issues alleged, presented, and disputed at trial – and upon which Mr. Honken's capital convictions on Counts 8 to 17 were necessarily based – were indistinguishable from the factual issues previously litigated and decided in Mr. Honken's favor in the same court. The court's prior determination of these issues was express and was obviously necessary to the final judgment in the 1997 to 1998 sentencing proceedings. Indeed, the issues were specifically contested by the parties, were integral to the court's final sentence of Mr. Honken, and were set

27

forth in specific findings in the transcript and in the final judgments. The court made these findings only after the Government had a full and fair opportunity to litigate the issues. In addition to extensive briefing and argument, the Government presented more than two dozen witnesses and scores of exhibits in support of its allegations over the course of five days of court hearings. In its pursuit of a life sentence for Mr. Honken, and despite its awareness of the potential "collateral consequences" of litigating these issues, the Government, with "thoroughness and zealousness," sought and obtained final factual findings from the sentencing court. Tr. 2/24/98 at 1239, 1228. The Government was thereafter bound by those findings, and its successful relitigation of those issues in Counts 8 to 17 of this case violated Mr. Honken's double jeopardy rights. *See Garrett v. United States*, 471 U.S. 773, 798 (1985).

### D. Counsel Were Ineffective

It is well established that trial counsel's failure to raise a timely objection to a constitutional violation constitutes deficient performance. *E.g., Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to raise constitutional objection to be deficient performance); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (same); *see also Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . ."); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (trial counsel ineffective for failing to litigate valid double jeopardy claim). Because "[f]ailure to

28

preserve an issue may result in the client being executed even though reversible error occurred at trial, . . . trial counsel in a death penalty case must be especially aware . . . of the heightened need to fully preserve all potential issues for later review." ABA Guideline 10.8 (cmt) (2003) (internal quotation omitted). Trial counsel must therefore "consider all legal claims potentially available" and present claims "as forcefully as possible." ABA Guideline 10.8.A.1 & 10.8.B.1.

Despite their obligations to pursue meritorious legal issues, and despite case law precluding relitigation of findings like those set forth above, trial counsel here unreasonably failed to object. Trial counsel did not have a strategic or tactical reason for this failure. *See* 2255 Tr. at 19-21 (Attorney Parrish); *id.* at 236-38 (Attorney Rogers); *id.* at 528-29 (Attorney Spies). Mr. Rogers was responsible for drafting a double jeopardy motion, but he either was not aware of the specific findings made in Mr. Honken's favor, or he overlooked the significance of those findings in preparing the motion. *Id.* at 236-38. Neither Mr. Spies nor Mr. Parrish noticed the omission, even after the District Court issued an opinion denying the motion well in advance of trial, in which the court explicitly noted that the defense had not asserted collateral estoppel. *Id.*; *see United States v. Honken*, 271 F. Supp. 2d 1097, 1106 n.2 (N.D. Iowa 2003).

Thus, despite being on notice of the issue, and despite the absence of any strategic concern or potentially adverse impact of pursuing this set of objections, trial

29

counsel simply failed to do so. This oversight apparently occurred because Mr. Rogers drafted the double jeopardy challenge, whereas Mr. Parrish was most familiar with the record from the prior sentencing proceedings in which he had represented Mr. Honken. *See* Pet. Ex. 119 at ¶ 4 (Rogers Decl.). Counsel was deficient.

Mr. Honken was prejudiced by counsel's failure. Mr. Honken could not have been convicted on Counts 8 to 17, and thus could not have been sentenced to death, if trial counsel had precluded the relitigation of these factual issues and/or invoked the court's prior findings in the Motion for Acquittal or the Motion for New Trial. Further, even if the jury had reached guilty verdicts on one or more of those counts, there is a reasonable likelihood that the penalty phase verdicts would not have resulted in a death verdict if counsel had objected to this evidence.

## E.     The District Court Erred in Denying the Claim and Denying a COA

The District Court did not address the *Strickland* component of this claim, did not discuss trial counsel's testimony regarding the issue, and apparently recognized that the prejudice flowing from counsel's alleged failure would have precluded Mr. Honken's conviction on the ten capital counts. *See* DCO 79. The court denied the claim by finding that Mr. Honken simply had no right to assert collateral estoppel with respect to the court's factual findings at the prior sentencing proceeding. The District Court gave four reasons for its ruling, but the court's reasons were erroneous and, at a minimum, were debatable among jurists of reason.

30

Appellate Case: 14-1329     Page: 34     Date Filed: 04/04/2014 Entry ID: 4141111

The District Court first distinguished *Ashe* on the ground that it involved *a jury's* guilt-phase determination, whereas Mr. Honken pled guilty in the prior drug case. DCO 74. This distinction is inapposite here, and the District Court's reliance on a footnote in *Ohio v. Johnson*, 467 U.S. 493 (1984), was misplaced. *See* DCO 74-75 (citing *Johnson*, 467 U.S. at 500 n.9). Unlike in *Johnson*, Mr. Honken's claim here does *not* rely on a prior guilt-phase determination and thus the manner in which guilt was adjudged is immaterial. Moreover, the footnote in *Johnson* was dicta and did not overrule *Ashe*'s extension of collateral estoppel rights to "an issue of ultimate fact [that] has been determined by a valid and final judgment." *Ashe*, 397 U.S. at 443. It is this standard upon which this claim relies, and there is no question that the 1998 sentencing findings were "determined by a valid and final judgment."

The District Court next ruled that "the issues addressed during a criminal trial and during a sentencing hearing are fundamentally different." DCO 75. In a sentencing hearing, in the District Court's view, the defendant does not have "the full panoply of rights that are due a defendant at trial." *Id*. The court thus found that "the application of collateral estoppel has no place outside of capital [sentencing] proceedings." *Id*. at 76.

This ruling was both novel and incorrect. The ruling was novel because no court has previously held that *Ashe* was *per se* inapplicable to non-capital sentencing findings. The ruling was incorrect because the District Court relied exclusively on

31

Appellate Case: 14-1329     Page: 35     Date Filed: 04/04/2014 Entry ID: 4141111

case law decided before *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and their progeny. *See* DCO 70-72, 76 (citing cases). By the time of this capital trial in 2004, however, the Supreme Court had repeatedly recognized that "[m]erely using the label 'sentence enhancement' to describe [certain conduct] surely does not provide a principled basis for treating [such conduct] differently" under the Constitution. *Apprendi*, 530 U.S. at 476. In the wake of *Apprendi*, the "dispositive question" with respect to sentencing determinations "is one not of form, but of effect." *Ring*, 536 U.S. at 602. The District Court's ruling thus relied on a formalistic distinction of sentencing proceedings that has been abrogated by the Supreme Court. In any event, the District Court's novel ruling is at least debatable among jurists of reason.

Third, the District Court curiously found that the factual issues determined at the two proceedings were not the same. DCO 76. The court reasoned that the factual issues were considered under different statutory provisions and according to different standards of proof, and pointed out that the government did not have the benefit, in the 1997 to 1998 proceeding, of all of the evidence it collected thereafter. *Id.* at 76-77. The District Court's points misconstrue the nature of double jeopardy and collateral estoppel. Collateral estoppel necessarily involves a factual element or issue, and thus the legal standard under which the facts are in dispute usually varies between the two proceedings.

32

Appellate Case: 14-1329    Page: 36    Date Filed: 04/04/2014 Entry ID: 4141111

The dispositive inquiry thus regards the underlying *factual* dispute. Here, the District Court recognized that, at the prior sentencing, the court made a "determination that the movant did not participate in the methamphetamine conspiracy from March 26, 1993, through March 21, 1995, or while on pretrial release." DCO 79. It is beyond dispute that the murders occurred during this same time period, and that, in the instant case, an element of each capital charge was that the murder occurred "while" the conspiracy was ongoing. N.D. Iowa Case No. 01-CR-3047-MWB, Doc. No. 46 (Superseding Indictment). Thus, the duration of the conspiracy was the *same fact* at issue in both proceedings, regardless of the statutory subsections or standard of proof under which the fact was determined.[8] Moreover, the Government's collection of more evidence in support of its factual allegations after the sentencing proceeding is the precise circumstance that double jeopardy and collateral estoppel are intended to foreclose, contrary to the District Court's reasoning.

Finally, the District Court weighed the competing interests at stake and decided

---

[8] It is of no consequence that the Government could not prove by a preponderance of evidence at the prior sentencing proceeding the same facts that it was required to prove beyond a reasonable doubt at trial. A different standard of proof precludes assertion of collateral estoppel only where the factual issue raised "in a subsequent action [is] governed by a *lower* standard of proof." *Dowling v. United States*, 493 U.S. 342, 349 (1990) (emphasis added).

33

Appellate Case: 14-1329    Page: 37    Date Filed: 04/04/2014 Entry ID: 4141111

that "the reexamination of an issue appears prudent if the effect of applying preclusion is to give one party a favored position." DCO 78. Because preclusion of the capital charges here would "confer[] a tremendous benefit on the accused," i.e., a life sentence without the possibility of release instead of a death sentence, the District Court found such a result would amount to a "manifestly inequitable administration of the law." *Id*. at 79. Appellant submits that weighing such policy interests is improper where the balance of interests has already been struck by the Fifth Amendment and the Supreme Court case law interpreting it. Moreover, where a judicial ruling on a constitutional claim depends on the court's weighing of competing policy interests, and refuses to grant relief because that would reduce the sentence from death to life in prison, the ruling is, at a minimum, debatable among jurists of reason.

### III. THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.[9]

Although counsel's mitigation specialist identified numerous red flags of mental health issues in Mr. Honken's dysfunctional upbringing and background, trial counsel failed to obtain a psychiatric or general psychological evaluation to explore the significance of Mr. Honken's background, to place the information uncovered by

---

[9] This issue was raised as Claim Nine below. *See* Doc. No. 19 at 81-104.

34

the mitigation specialist into a mental health perspective, or to assist in the discovery of additional mitigation evidence. Counsel thus failed to thoroughly investigate the available mitigating evidence and failed to present compelling mental health and lay witness evidence in mitigation. Counsel's ineffectiveness prejudiced Mr. Honken and violated the Sixth Amendment.

### A. Counsel Failed to Investigate and Present Mental Health Evidence

Counsel was alerted well in advance of trial that Mr. Honken's background contained red flags indicating the need for a mental health evaluation. Counsel retained a mitigation specialist, Lisa Rickert, and her investigation revealed that Mr. Honken suffered from, *inter alia*, obsessive behaviors, repressed early childhood memories, traumatic childhood experiences, bizarre eating habits, and attachment problems. *See* Doc. No. 69 at 10, 12, 16. Based on her investigation, Ms. Rickert repeatedly recommended that trial counsel obtain appropriate mental health evaluations. *Id.* at 10-12. Counsel, however, obtained only an eleventh-hour neuropsychological evaluation that addressed the limited question of whether Mr. Honken had brain damage, but counsel failed otherwise to have Mr. Honken evaluated for the presence of mental health mitigation.

In a capital case, counsel has a duty to conduct a thorough mitigation investigation, *Williams v. Taylor*, 529 U.S. 362, 398 (2000), and any limits on the investigation must be reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Here,

35

counsel was on notice that Mr. Honken had endured a damaging upbringing and that a mental health evaluation was necessary. *See, e.g.*, 2255 Tr. at 243 (Attorney Rogers); *id.* at 549-50 (Attorney Spies); Doc. No. 69 at 10-12, 16, 44. Under these circumstances, counsel had a Sixth Amendment duty to obtain appropriate evaluations and to reasonably consult with the proper experts. *E.g.*, *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (counsel's "decision not to investigate did not reflect reasonable professional judgment" where counsel "ignored pertinent avenues for investigation of which he should have been aware"); *Rompilla v. Beard*, 545 U.S. 374, 391 n.8 (2005) (counsel "could not reasonably have ignored mitigation evidence or red flags" indicating the need for more testing or evaluation); *see also Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (finding deficient performance where counsel limited scope of mental health expert's evaluation and ignored red flags requiring broader investigation of mental health).

Counsel's failure to obtain appropriate mental health evaluations was based on their misplaced concern that additional evaluations would automatically trigger a rebuttal evaluation by a government expert that might result in a finding of anti-social personality disorder (ASPD). *E.g.*, 2255 Tr. at 263 (Attorney Rogers); *id.* at 549 (Attorney Spies). This was an unreasonable basis upon which to limit their mental health investigation, because counsel would *not* have been required to disclose any expert report until they decided to call the expert, and, in any event, not until the

36

Appellate Case: 14-1329     Page: 40     Date Filed: 04/04/2014 Entry ID: 4141111

conclusion of the merits phase of trial.  *See* FED. R. CRIM. PRO. 12.2.

Counsel admitted their error at the evidentiary hearing.  Learned counsel, Mr. Rogers, testified that the defense team should have followed Ms. Rickert's recommendation to have Mr. Honken evaluated by mental health experts (other than a limited evaluation for brain damage).  *See* 2255 Tr. at 243.  Mr. Spies, the member of the defense team who worked closest with Ms. Rickert and who presented the mitigation case to the jury, concurred with Mr. Rogers, stating that counsel "should have had Mr. Honken evaluated to at least see what the results would have been before making this determination."  *Id.* at 550.

Even with respect to the single expert that was retained, counsel's performance also was deficient.  Counsel failed to provide sufficient background materials to Dr. Gelbort.  *See* Doc. No. 70 at 65 (Dr. Gelbort's testimony that he would have requested collateral data if his involvement had continued after July 22, 2004).  Counsel failed to ask Dr. Gelbort to conduct a general psychological examination or a mitigation evaluation, despite Ms. Rickert's recommendation.  And counsel failed to provide relevant information or ask Dr. Gelbort to consider the impact of Mr. Honken's methamphetamine addiction on his functioning in the months leading up to the crimes.  *Id.* at 15 (Dr. Gelbort's testimony that he was only asked to do a battery of neuropsychological testing).

Moreover, counsel waited until the very last minute to decide whether to

37

pursue mental health mitigation, and by then further mental health investigation was hamstrung by time constraints. The record shows that the decision about what expert to engage was based on hasty determinations made at virtually the same time the defense team was required to disclose to the court and the government the nature of any expert testimony that would be presented. The trial court set the date for expert disclosures as July 21, 2004. *See* 2255 Tr. at 542. Trial counsel did not arrange for Dr. Gelbort to evaluate Mr. Honken until July 19, 2004, and did not provide his report to counsel until July 21, 2004 – the last day for the defense to decide whether to use Dr. Gelbort or any other mental health expert under the trial court's order. *See* Pet. Ex. 11 (Report of Dr. Gelbort); *see also* 2255 Tr. at 274 (Attorney Rogers).

Counsel thus waited until the last minute to have Mr. Honken evaluated at all, and even then the evaluation only addressed potential brain damage. *See* Doc. No. 70 at 40 (Dr. Gelbort: "The attorneys needed some sort of report within a couple days."). By then, counsel had left themselves no time to pursue recommendations for further evaluation and investigation identified by Dr. Gelbort; to follow Ms. Rickert's recommendation to have Mr. Honken evaluated to explore the psychiatric and emotional issues she identified during her mitigation investigation; to seek mental health expertise regarding the damaging effects of Mr. Honken's methamphetamine addiction; or to otherwise procure expert mental health testimony to present at the penalty phase of trial. Counsel was deficient.

38

Counsel's decision to forgo mental health evidence was not reasonable or strategic. Rather, "[t]heir decision to end their investigation when they did was neither consistent with the professional standards . . . nor reasonable in light of the evidence counsel uncovered . . . that would have lead a reasonably competent attorney to investigate further." *Wiggins*, 539 U.S. at 534; *id.* at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

**B.      Counsel's Failure to Develop Mitigating Evidence Was Prejudicial**

Prejudice is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This "undermines confidence" – "reasonable probability" standard is less demanding than proof by a preponderance of the evidence. *Id.*; *Williams*, 529 U.S. at 405-06; *Kenley v. Armontrout*, 937 F.2d 1298, 1304 n.5 (8th Cir. 1991).

At trial, counsel painted a superficial portrait of Mr. Honken's upbringing, which the Government successfully rebutted in its closing argument as not mitigating and not "that different from the vast majority of people." Tr. at 3915. Because counsel failed to consult with the proper experts, the jury never heard how Mr.

39

Honken's background of trauma and addiction affected his behavior and why his background and upbringing were compelling mitigating factors. At the § 2255 hearing, Mr. Honken presented substantial mitigating evidence that the sentencing jury did not hear, thus establishing prejudice.

Psychiatrist Richard Dudley was provided with Mr. Honken's history and other background materials detailing his troubled upbringing. He also evaluated Mr. Honken and interviewed several family members and friends. Dr. Dudley testified that Mr. Honken had "an extremely difficult childhood . . . characterized by an abusive and kind of threatening sort of environment . . . that was made worse by the absence of any sort of safe space or comfort that would have mitigated against the impact of that environment." Doc. No. 72 at 23. Dr. Dudley concluded that the effect of growing up in such an environment "create[d] an enormous amount of anxiety and uncertainty and fear about what's going to happen next, and what we call kind of an over-reactivity[.]" *Id.* at 29. Dr. Dudley diagnosed Mr. Honken with Anxiety Disorder, NOS (not otherwise specified), Personality Disorder, Mixed Type, with Narcissistic and Borderline Features, and Methamphetamine Dependence. *Id.* at 22. These disorders impaired Mr. Honken's judgment and decision-making process, and also were exacerbated by his drug addiction. *See id.*

Mr. Honken became dependent on nearly pure methamphetamine, which he used on an almost daily basis in 1992 and early 1993. *E.g.*, 2255 Tr. at 315-18. The

40

jury never heard the harmful effects that methamphetamine abuse had on Appellant. As Melissa Piasecki, M.D., testified in post-conviction, methamphetamine becomes addictive within weeks or months of use, and the types of pyschosocial factors found in Mr. Honken's troubled background increased the risk of methamphetamine addiction for him.

Dr. Piasecki described the harmful effects of methamphetamine on brain structure and brain functioning. Methamphetamine is neurotoxic, which means that it causes damage within a few months of use, including impaired memory, executive functioning, and impulse control. Doc. No. 68 at 15-20. Methamphetamine abuse is highly correlated with violent behavior, even when the abuser is not actually intoxicated, and with anxiety issues. *Id.* at 21-23, 54-55. This information was known in the medical and scientific communities at the time of trial. Counsel, however, never investigated the harmful effects of Mr. Honken's methamphetamine addiction and did not consult with an appropriate mental health expert.

Dr. Gelbort testified that he concurred with the findings of Dr. Piasecki regarding the effects of drug abuse. Doc. No. 70 at 53 ("[T]here's certainly a possibility that drug use/abuse would be one of the reasons why [Mr. Honken] was demonstrating some weaknesses on the neuropsych evaluation."). Thus, had Dr. Gelbort been provided with background materials documenting Mr. Honken's drug addiction, and had he not been asked to conduct only a limited neuropsychological

41

evaluation at the last minute, this mitigation could have been presented to the jury.

Trial counsel testified that they refrained from having Mr. Honken evaluated because they feared that an evaluation would trigger a rebuttal examination from the government with a diagnosis of ASPD. However, Christopher Grote, Ph.D., the government's post-conviction expert, did not diagnose Mr. Honken with ASPD. Rather, while finding that Mr. Honken does not suffer cognitive dysfunction, Dr. Grote nonetheless endorsed aspects of Mr. Honken's case in mitigation. For example, Dr. Grote concurred with Dr. Piasecki's report regarding the objective effects of methamphetamine abuse. Doc. No. 70 at 69. Dr. Grote also endorsed the principles that a family history of substance abuse and mental illness, and an upbringing replete with threats of violence, can affect a child's psychological and emotional makeup and place the child at risk for developing various mental disorders. *Id.* at 59-64. Thus, Dr. Grote implicitly affirmed that Mr. Honken's upbringing likely affected his emotional development.[10]

The overall picture that effective counsel would have presented is that Mr. Honken had a traumatic childhood and upbringing, and these experiences resulted in psychological and psychiatric deficits that are inherently mitigating. There is a

---

[10] While Dr. Grote summarily concluded that Mr. Honken's family upbringing and father's influence were not mitigating, *id.* at 30-32, he had no experience in capital cases and did not review witness declarations or other collateral background documents about Mr. Honken's upbringing. *Id.* at 33-34, 36-38, 64.

42

reasonable probability that at least one juror would have voted for life in light of this evidence, thereby establishing prejudice.

## C.     The District Court Erred in Denying the Claim and Denying COA

After evaluating trial counsel's performance, the District Court concluded that, under *Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006), trial counsel's "anticipation of the government's response is a proper basis for not choosing to present mental health evidence." DCO 234. The court's reliance on *Link* was misplaced. As described above, counsel never *obtained* the available mental health evaluations of Mr. Honken and thus counsel could not make an informed decision about what could be *presented* at penalty phase. Such a decision is not subject to deference because it was not informed by thorough investigation. *E.g.*, *Wiggins*, 539 U.S. at 523 (*Strickland* analysis focuses "on whether the investigation supporting counsel's decision . . . was itself reasonable."); *see also Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011) ("[I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable investigation as to what to *present* at sentencing.") (emphasis in original).

The District Court's analysis was clearly erroneous in several additional respects. First, the court repeatedly speculated about other strategic decisions that counsel "could have made" under the circumstances of this case. *E.g.*, DCO 223-24 (trial counsel "could have" relied on 1997 pre-sentence examination to conclude that

Appellant did not have a mental illness); *id.* at 224 (trial counsel "could have" relied on Ms. Rickert's reports to conclude that Appellant was raised in a "stable and nurturing environment"); *id.* (trial counsel "could have" relied on Dr. Gelbort's report to determine that Appellant did not have significant cognitive impairments).[11] Under *Strickland*, a court may not speculate about possible strategic decisions where, as here, the record demonstrates that counsel's actions were not based on such decisions. *See Wiggins*, 539 U.S. at 526-27 ("the strategic decision [invoked] to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations"); *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy for counsel); *Williams v. Roper*, 695 F.3d 825, 846 (8th Cir. 2012) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer") (quoting *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)).

Second, the court repeatedly described mitigation as evidence that "justified or excused the crimes that [Appellant] had been found guilty of committing." DCO 245; *see also id.* at 264, 267. The court likewise upheld limitations on counsel's

---

[11] *See also id.* at 234, 236, 239, 241, 245 (variously describing what counsel "could have" or "would have" done).

Appellate Case: 14-1329    Page: 48    Date Filed: 04/04/2014 Entry ID: 4141111

investigation because the evidence they could have discovered did not have a causal link to the crimes or because it was remote in time from when the crimes occurred. *See, e.g.*, *id.* at 277 ("expert evidence concerning the impact that [Appellant's] upbringing and use of drugs as an adult had on him is entitled to little, if any, mitigating weight" because of Mr. Honken's age). This reasoning is clearly erroneous under *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *Tennard v. Dretke*, 542 U.S. 274 (2004). Mitigating evidence includes any evidence that "might serve as a basis for a sentence less than death" *Skipper*, 476 U.S. at 4, and the defendant need not "establish[] a nexus to the crime." *Tennard*, 542 U.S. at 287; *accord McKoy v. North Carolina*, 494 U.S. 433, 441 (1990) (recognizing that "evidence was undoubtedly relevant to mitigation even if it did not excuse the defendant's conduct").

Third, the court criticized the credibility and findings made by defense experts because they reviewed collateral materials, DCO 256, and were not asked to explore Mr. Honken's state of mind at the time of the crimes. *Id.* at 264. As the United States Supreme Court has recognized, reviewing collateral data is appropriate for a forensic mental health expert. *E.g.*, *Rompilla*, 545 U.S. at 391 (finding that collateral sources of information "would have destroyed the benign conception of Rompilla's upbringing and mental capacity [that] defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of mental

45

Appellate Case: 14-1329     Page: 49     Date Filed: 04/04/2014 Entry ID: 4141111

health experts"). Further, Mr. Honken did not raise guilt phase mental health claims, and thus his *mens rea* at the time of the crimes was not at issue.

Fourth, the court concluded that "there was very little that could be done to nullify the overwhelming aggravating evidence." DCO 277. Contrary to the court's conclusory statement, highly aggravated cases have resulted in life sentences.[12] Indeed, the Eighth Amendment *requires* that "the sentence imposed at the penalty stage . . . reflect a reasoned moral response to the defendant's background [and] character, *and not merely the crime*." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation omitted); *see also Walbey v. Quaterman*, 309 F. App'x 795, 804 (5th Cir. 2009) ("habeas relief . . . would virtually never be available" if the recitation of egregious facts was all that was needed "to offset prejudicial legal error"). The District Court thus erred in relying on the aggravated nature of the crimes to discount

_____

[12] *E.g.*, *United States v. Moussaoui*, No. 01-CR-455 (E.D. Va.) (life verdict returned against conspirator in 9/11 attacks); *United States v. Nichols (Terry)*, No. 96-CR-68 (D. Colo.) (life verdict for Timothy McVeigh's codefendant in the Oklahoma City bombing that killed 168 people); *State v. Nichols (Brian)*, No. 05SC29988 (Ga. Super.) (life verdict for defendant convicted of murdering a judge, court reporter, sheriff's deputy, and federal agent and taking a fifth victim hostage during an escape from an Atlanta courthouse); *State v. Lingle*, 140 S.W.3d 178 (Mo. App. 2004) (life verdicts for the murders of a pregnant mother and her three children); *State v. Matthews*, No. M2005-00843-CCA-R3-CD, 2008 WL 2662450 (Tenn. Ct. Crim. App. 2008) (life verdicts for execution-style murders of four people); Terry Pristin, *Jury Votes to Spare Life of Killer of 4 Women*, Los Angeles Times (Aug. 9, 1986) (life verdicts for defendant guilty of murdering four elderly women while committing rape, sodomy, arson, and burglary).

Appellate Case: 14-1329    Page: 50    Date Filed: 04/04/2014 Entry ID: 4141111

the impact of the unpresented mitigation evidence. *E.g.*, *Porter*, 668 U.S. at 37, 42 (state court's prejudice analysis unreasonable where it discounted evidence of Porter's abusive childhood).

In light of trial counsel's ineffective assistance, Appellant was entitled to relief from his death sentence, and the District Court erred in denying this claim. At minimum, reasonable jurists could debate trial counsel's ineffectiveness, and a COA should therefore issue.

**IV. THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY LITIGATE THIS ISSUE.[13]**

At the penalty phase of Appellant's trial, the Government presented highly charged victim impact evidence from several witnesses. Following trial, the judge had the following to say about this testimony:

> I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee*, 501 U.S. 808 (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty

---

[13] This issue was raised as Claim 11 below. *See* Doc. No. 19 at 112-19.

Appellate Case: 14-1329    Page: 51    Date Filed: 04/04/2014 Entry ID: 4141111

> case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the Honken trial and the juror's sobbing during the victim impact testimony still rings in my ears.

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005). The court went on to note that "such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias." *Id.*

Compounding the potential for inflamed emotion and bias on the part of jurors, the trial judge had an open emotional reaction while the victim impact witnesses were testifying. This combination of factors violated Appellant's rights under the Due Process Clause and the Eighth Amendment, and counsel were ineffective in their handling of the issue. The § 2255 Court erred in ruling to the contrary. Furthermore, the ruling of the § 2255 Court denying Appellant the ability to interview jurors regarding this emotional display prevented Appellant from fully developing this claim. The § 2255 Court's ruling in this regard ran afoul of Federal Rule of Evidence 606(b). Proper resolution of this claim – including the propriety of interviewing and presenting testimony from jurors regarding the extraneous influence of the trial judge's reaction – is debatable among jurists of reason. This is particularly evident now, given that the issue of the proper interpretation of Rule 606(b) is currently pending before the United States Supreme Court in *Warger v. Shauers*, No. 13-517.

48

Victim impact evidence is admissible as a "legitimate way 'of informing the sentencing authority about the specific harm caused by the crime in question.'" *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010) (*quoting Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). The prosecution "does not have unfettered discretion to offer such evidence, however. If a witness or remark in a particular case so infects the sentencing proceeding so as to render it fundamentally unfair, the defendant may seek relief under the Due Process Clause." *Storey v. Roper*, 603 F.3d 507, 517 (8th Cir. 2010). Indeed, the Supreme Court in *Payne* contemplated only that victim impact evidence would provide "a quick glimpse of the life which a defendant chose to extinguish." *Payne* 501 U.S. at 822 (internal quotation marks omitted). The Court certainly did not intend to allow prosecutors to introduce evidence that would allow jurors to render life-or-death verdicts on the "improper basis of inflamed emotion and bias." *Johnson*, 362 F. Supp. 2d at 1107.

The victim impact evidence in this case was comprised of testimony that went far beyond the "quick glimpse" into the lives of the victims that *Payne* contemplated. It included testimony that the killings caused the entire family of one victim to develop high blood pressure and/or diabetes, and hastened the death of another victim's father. Tr. 3480, 3503-04. It also included heart-wrenching testimony regarding the child victims, including photographic displays of them in Halloween costumes. Tr. 3514

49

This extremely charged testimony caused the trial judge to react emotionally in front of the jury. This display occurred during the testimony of several of the victim impact witnesses. Tr. 3669-3671 (counsel making record of their observations). Counsel's observations included that the judge "did visibly cry," that the judge's "expression reddened," that "the Court on a couple of occasions raised its head into the air and I believe in an effort to contain the Court's emotion," and that the judge's "facial expression changed substantially during each of the time[s] the testimony was offered with regard to these three people's testimony." *Id.* at 3669-70. Counsel specifically noted that "[o]n one occasion at a minimum [he] observed a couple of the jurors look at the Court during the expression on the Court's face, then quickly look away at that point." *Id.* at 3670. While the trial court disputed counsel's statement that it was crying during portions of the testimony, it did not dispute that "there was some emotion in my voice," as "it was very emotional testimony." Tr. 3669, 3674. The court also observed that while it did not want to take evidence at that time – and counsel was not asking to put on evidence – the taking of evidence on the issue "may come and probably will come at a later day." *Id.* at 3674.

In the proceedings below, Appellant alleged that the victim impact evidence and the trial court's emotional display violated his due process and Eighth Amendment rights, and that counsel was ineffective in failing to properly litigate these issues. Appellant sought to put on the hearing that was not put on at trial.

50

Appellant asked to present evidence from the trial jurors regarding the extraneous and prejudicial influence of the trial judge's visible emotional display. *See*, *e.g.*, *United States v. Rodriguez*, 116 F.3d 1225, 1227 (8th Cir. 1997) (holding that extraneous influences include "publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and outside persons") (quoting *United States v. Bassler*, 651 F.2d 600, 602 (8th Cir. 1981)).

To accomplish this, Appellant sought permission from the District Court to interview jurors regarding whether they viewed the trial judge's reaction. Doc. No. 32 at 6-10; *see also* N.D. Iowa L.R. 47 (prohibiting parties to a case from contacting jurors, except by leave of court). In the motion, Appellant acknowledged the limits of Rule 606(b) as construed by Eighth Circuit law and argued that the evidence he sought to introduce would be fully compliant with those limits. *See* Fed. R. Evid. 606(b) (limiting the ability to present testimony from jurors, except in certain circumstances); s*ee also*, *e.g.*, *Honken*, 541 F.3d at 1168-69 (holding that Rule 606(b) permits jurors to testify as to the existence of extraneous information or outside influence, but not as to the effect of such information or influence).

The District Court denied Appellant's motion for access to jurors. It ruled that "under Federal Rule of Evidence 606(b), any testimony of the jurors in this case would be limited to whether extraneous information or outside influences existed."

51

Doc. No. 41 at 15. "Given the constraints of Federal Rule of Evidence 606(b), the movant's claims for relief and the existing record," the District Court was unable to discern any legitimate reason for counsel to interview jurors. *Id.*

The § 2255 Court then denied the claim on the merits. It first determined that the victim impact evidence did not violate the Constitution. DCO 302. It then ruled that the trial court's emotional reaction – which it characterized as "limited," despite the fact that it precluded testimony on the issue – did not deprive Appellant of a fair penalty phase proceeding. *Id.* at 302-03. It finally ruled that, as a result, counsel was not ineffective for their failure to litigate the issue. *Id.* at 303.

The § 2255 Court committed error when it denied this claim without permitting evidentiary development. The § 2255 Court ruled that Appellant "merely speculates that, because a judge has considerable influence over a jury, it is likely that the presiding judge's limited emotional reaction intimated to the jury what sentencing decision to make." DCO 307. But the court cannot fault Appellant for offering mere "speculation," while at the same time preventing him from interviewing the relevant witnesses or presenting their testimony at a hearing. Appellant provided the § 2255 Court a detailed proffer on what he felt the evidence would show, based upon the observations of counsel in the trial record, and noted that the trial court felt an evidentiary hearing on the issue would be appropriate at a future date. Moreover, as Appellant argued below, proper interpretation of Rule 606(b) does not foreclose

52

presentation of the type of evidence Appellant seeks to present. The court's refusal to permit development of this issue was improper.

It was similarly improper for the court to characterize the trial court's reaction as "limited" without the benefit of any testimony. The parties at trial provided vastly different accounts of the magnitude of the judge's reaction on the record at trial. The trial court made no findings on the issue (other than to dispute that he was visibly crying) and simply deferred the issue to a future date. Yet the § 2255 Court went so far as to say that "there is no chance the jury's sentencing decision came under undue or improper influence." *Id.* at 307. Not only does this absolutist proclamation conflict with the substantially more ambivalent views of the trial judge (who actually witnessed the victim impact testimony), there was simply no basis for the § 2255 Court to make findings on this issue, given the lack of an evidentiary hearing.[14]

Given that the § 2255 Court's denial of a hearing rested in large part on its construal of Rule 606(b), the issue is debatable among jurists of reason, as evidenced by the United States Supreme Court's recent grant of certiorari in *Warger v. Shauers*, No. 13-517. In *Warger*, a case from this Circuit, this Court reasoned that "[i]n order

---

[14] The § 2255 Court's ultimate ruling that counsel were not ineffective in litigating this issue was dependent on its earlier denial of a hearing and its ruling, on an incomplete record, that no underlying constitutional violation occurred. As such, the § 2255 Court's ruling on ineffectiveness was erroneous for the same reasons, and should be revisited by this Court on appeal.

53

to achieve finality in the litigation process and avoid relentless post-verdict scrutiny and second guessing, occasional inappropriate jury deliberations must be allowed to go unremedied." *Warger v. Shauers*, 721 F.3d 606, 612 (8th Cir. 2013). The Court concluded that "Rule 606(b) precludes jurors from testifying in regards to jury deliberations for the purpose of challenging a verdict," even in cases involving juror dishonesty during voir dire. *Id.*

The Supreme Court's grant of certiorari in *Warger* obviously calls this Court's reasoning on the issue into question. Almost by definition, the proper interpretation of Rule 606(b), which is central to the proper resolution of this claim, is debatable among jurists of reason. *See*, *e.g.*, *Warger*, Pet. for Cert. at 9-19, *available at* http://www.scotusblog.com/case-files/cases/warger-v-shauers/ (describing circuit split and importance of the issue). This Court should grant a certificate of appealability on the issue.

**V.    THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE APPELLANT WAS DEPRIVED OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN THE TRIAL COURT DISMISSED A JUROR DURING PENALTY PHASE DELIBERATIONS BUT UPHELD THE GUILT PHASE VERDICT, AND COUNSEL INEFFECTIVELY LITIGATED THESE ISSUES.[15]**

On the first day of penalty phase deliberations, Juror 523 told a court staff

---

[15] This issue was raised as part of Claim 17 below. *See* Doc. No. 19 at 156-64. Other aspects of Claim 17 are not being pursued in this application.

Appellate Case: 14-1329    Page: 58    Date Filed: 04/04/2014 Entry ID: 4141111

member that her boss had been making inappropriate comments to her about Appellant's trial. *United States v. Honken*, 381 F. Supp. 2d 936, 1018 (N.D. Iowa 2005). Juror 523 claimed that her boss had made comments to the effect of "fry him" and "guilty, guilty, guilty," among other things. *Id.* Following the disclosure of this information, the court questioned Juror 523 at length, along with each of the other jurors, to attempt to assess the extent of any improper influence. *Id.* at 1018-25. Ultimately, the trial court replaced Juror 523 with an alternate, who participated in the remainder of the penalty phase deliberations and rendered penalty phase verdicts with the other jurors. *Id.* at 1025.

Following the penalty phase, the court held an evidentiary hearing on a post-trial motion in which Juror 523 again testified, along with her boss and other coworkers. *Id.* at 1026. Based upon the evidence presented at these hearings, defense counsel argued that Appellant was entitled to post-trial relief as a result of the comments reportedly made to Juror 523. The trial court disagreed. It found Juror 523 incredible as a matter of fact and found that most of the claimed statements were never made. *Id.* at 1032-34. The court specifically found that "it was the stress of involvement in the trial that caused Juror 523 to magnify (and indeed, multiply) the single incident of an innocuous comment from her boss" into the serious and unfounded allegations she made during the various hearings on the issue. *Id.* at 1034. This stress manifested itself in "a desire to finish deliberations as quickly as possible

55

and to 'get her life back..'" *Id.* The court declined to "speculate about whether Juror

523 intentionally fabricated the additional comments." *Id.*

While issues surrounding Juror 523 were litigated during trial, post-trial, and

on direct appeal, neither trial nor appellate counsel raised the most basic issue

presented by this incident. Namely, trial and appellate counsel failed to challenge the

fact that a juror who was found incredible by the court, and who may well have

committed perjury, had already rendered guilt phase verdicts. In other words, Juror

523's discredited claims and testimony during penalty phase deliberations called into

question her impartiality and fitness to render the guilt phase verdicts as well.

The Sixth Amendment right to jury trial "guarantees to the criminally accused

a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717,

722 (1961); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548,

554 (1984) ("One touchstone of a fair trial is an impartial trier of fact – 'a jury

capable and willing to decide the case solely on the evidence before it'") (quoting

*Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Juror dishonesty may require a new trial

where a party demonstrates that a "juror failed to answer honestly a material question

on voir dire and then further show that a correct response would have provided a

valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

In light of the trial court's findings on the post-trial motion, this claim meets

the *McDonough* standard for establishing juror dishonesty. Juror 523's false claims,

Appellate Case: 14-1329    Page: 60    Date Filed: 04/04/2014 Entry ID: 4141111

made under oath during and after penalty phase deliberations, certainly call into question the truthfulness of her voir dire testimony and her overall fitness as a juror. Her untrue statements – which fabricated or significantly exaggerated external pressures to execute Mr. Honken – exposed her patent inability to be an impartial and disinterested juror.

Indeed, had the true nature of Juror 523's stress and improper desire to end trial "as quickly as possible" in order to "get her life back" been revealed during voir dire, she obviously would have been excused for cause. *See*, *e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (an impartial jury consists of "jurors who will conscientiously apply the law and find the facts"). Criminal trials – and particularly capital murder trials – require that jurors be truthful, follow the court's instructions, and decide the case based solely upon the evidence presented. *Id.*; *see also Smith*, 455 U.S. at 217 (a fair trial requires "a jury capable and willing to decide the case solely on the evidence before it."). Juror 523 was not fit to serve on Appellant's jury, and had she been honest during voir dire, she never would have.

While trial counsel did raise and litigate certain claims relating to Juror 523, they never asserted that her discredited testimony during the penalty phase hearing and post-trial hearing revealed that her voir dire testimony was unreliable or that the guilt phase verdicts she had reached were tainted. Appellate counsel was also ineffective. They had the trial court's credibility findings in hand when they raised

57

issues relating to Juror 523, and there was no legitimate reason for failing to recognize and litigate the significance of her dishonest answers.

Appellant was prejudiced by counsel's failings. Had this issue been properly raised and litigated at trial or on direct appeal, there is a reasonable probability that the trial court or this Court would have found Juror 523 to have provided untrue answers during voir dire and to have tainted the guilt phase verdicts. Appellant was prejudiced under the *McDonough* framework and is entitled to a new trial in front of an impartial jury.

The § 2255 Court erred in denying this claim. The court first suggested that it was precluded from considering this claim because it had previously been litigated on direct appeal. DCO 375. But that is simply incorrect. Nowhere in either the motion for new trial or the direct appeal opinion did either the trial court or this Court consider whether Juror 523 was dishonest during voir dire or otherwise unfit to reach the guilt phase verdicts that were entered into judgment.

The § 2255 Court went on to deny the claim on the merits, but in so doing it drastically minimized the import of Juror 523's actions and overlooked the trial court's findings. It is an extraordinarily serious matter for a juror to trump up charges of juror tampering during the middle of a capital murder trial. Indeed, the trial court's findings imply that Juror 523 may have committed perjury in the process.

The § 2255 Court nonetheless denied the claim, ruling that Appellant's

58

"eagerness to assume from the circumstances surrounding Juror 523 that she rushed to judgment and determined his guilt based on factors other than the evidence does not outweigh her unequivocal answers that demonstrated she would serve fairly and impartially throughout the proceedings." DCO 376. The court's willingness to take Juror 523's assurances of impartiality at face value was misguided, given that the trial judge *found her testimony incredible*. All of the trial court's findings made clear that Juror 523 *was* attempting to rush to judgment and *had* allowed improper considerations to guide her decision-making process. Those findings are law of the case, which the § 2255 Court was not at liberty to disregard.

In sum, the ruling of the § 2255 Court overlooks the clear findings of the trial court; the natural consequence of the trial court's findings was that Appellant was denied a fair trial by an impartial jury. Appellant's claim that trial and appellate counsel were ineffective in failing to properly litigate this claim is debatable among jurists of reason. This is particularly evidence given the grant of certiorari in *Warger v. Shauers*, No. 13-517. The Supreme Court's decision in that case will not only set forth the proper interpretation of Rule 606(b), it will also speak to the issue of juror dishonesty. *See Warger*, No. 13-517, Pet. for Cert. at i (stating question presented as "[w]hether Federal Rule of Evidence 606(b) permits a party moving for a new trial based on juror dishonesty during voir dire to introduce juror testimony about statements made during deliberations that tend to show the alleged dishonesty.").

59

WHEREFORE, Appellant respectfully requests that the Court issue a Certificate of

Appealability.


Respectfully Submitted,


/s/ Shawn Nolan
Shawn Nolan
Aren Adjoian
Timothy Kane
Federal Community Defender Office
  for Eastern District of  Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Dated:        April 4, 2014

Appellate Case: 14-1329    Page: 64    Date Filed: 04/04/2014 Entry ID: 4141111

## Certificate of Service

I, Shawn Nolan, hereby certify that on this 4th day of April, 2014, I filed the foregoing Petition for Certificate of Appealability with service via electronic delivery to:

C.J. Williams
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825

/s/ Shawn Nolan
Shawn Nolan

Appellate Case: 14-1329   Page: 65   Date Filed: 04/04/2014 Entry ID: 4141111